HEALD *et al., Appellants,* v. DONNELL *et al.*

### Division Two, May 8, 1894.

Equity: FRAUD: RESCISSION OF DEED. A deed of quitclaim by which a widow released her dower pursuant to a compromise of suit therefor will not be set aside for fraud, when the grantor fully understood her rights, was represented by her own attorney and attended by her sister, husband and brother who read the deed in full at the time it was executed.

*Appeal from Jackson Circuit Court.*—HON. J. W. HENRY, Judge.

AFFIRMED.

*H. C. McDougal* and *C. F. Moulton* for appellants.

(1) On the pleading and evidence the decree should have been for the plaintiff; and the court erred in rendering the decree it did; and erred in refusing to grant appellant's motion for a new trial. See authority cited below. (2) A deed obtained by fraud would be void. It would be a fraud if falsely read to a person and the person induced to sign it. Kerr on Fraud and Mistake, 50, 51; *Gottschalk v. Kircher,* 109 Mo. 183; *McElroy v. Maxwell,* 101 Mo. 294; *Kant v. Gerdemann,* 109 Mo. 552; and in all cases, when deception, treachery and fraud have been practiced. *McDonaguh v. Daly,* 3 Mo. App. 606; *State v. Lewis,* 74 Mo. 226. (3) Gross

Heald v. Donnell.

inadequacy of consideration is evidence of fraud.
Kerr on Fraud and Mistake, 187. If so gross as to
shock the conscience, would amount to fraud. *Byers v.
Sargent*, 19 How. U. S. 303; *Morrison v. Phillber*, 30
Mo. 145; and this where the case presents elements of
a suspicious nature. Story's Eq., sec. 211; and where
the facts present circumstances of a peculiar relation.
*Juzan v. Tarlmin*, 44 Am. Dec. 448; *Lister v. Mahan*,
60 Am. Dec. 530; *Turner v. Turner*, 44 Mo. 535.

*G. F. Ballingal* and *Botsford & Williams* for
respondents.

(1) That it is perfectly competent for a court of
equity to set aside a deed for fraud is settled. But it
is equally certain that before this relief will be granted,
the evidence of the fraud must be "most clear and con-
vincing," definite and positive, so as to admit of no
reasonable ground for doubt. *Jackson v. Wood*, 88
Mo. 78; *Sweet v. Owens*, 109 Mo. 7. (2) On the
pleadings and evidence in this case the finding and
judgment of the court were eminently just and right.
The testimony of appellants, and the brother and sister
of Mrs. Heald, concerning the execution of the deed in
controversy was directly contradicted by her own
attorney, by the attorney of respondents, and by all
the facts and circumstances of the case. (3) The
learned chancellor trying the case, having all the wit-
nesses before him and judging of the credibility of
each, found against appellant's contention of fraud,
and that finding, being abundantly supported by cred-
ible, disinterested and competent testimony, should
not be disturbed. *Rawlings v. Rawlings*, 102 Mo. 567;
*Taylor v. Cayce*, 97 Mo. 249; *Mathias v. O'Neil*, 94
Mo. 529, and cases cited; *Cox v. Cox*, 91 Mo. 78;
*Bank v. Murray*, 88 Mo. 191; *Cox v. Esteb*, 68 Mo. 114.

GANTT, P. J.—William H. Twyman, at the time of his death in March, 1874, was the owner of a tract of land containing two hundred and three acres, in the Blue river bottom, Jackson county, Missouri, and also the owner in fee of a smaller tract of nineteen acres, two and one-half miles distant, upon which he lived with his family at the time of his death, and upon which his widow and children have since resided. On the death of Twyman his administrator took possession of the two hundred and three acres, and these lands were subsequently sold by his administrator for the payment of the debts of his estate. The first sale by the administrator Jesse Noland, of one hundred acres, was made at private sale, June 8, 1875, and the widow, on the same day, made a quitclaim deed to the purchaser, releasing all her interest in the lands so sold. Subsequently, in February, 1881, the then administrator sold the remaining one hundred and three acres of said bottom land, and afterwards, in February, 1885, the widow made to the purchaser and then owner a quitclaim deed covering these lands, and also including the lands sold by Noland in 1875, being the entire two hundred and three acres.

This suit is to set aside said quitclaim deed executed by appellants, Elizabeth E. Heald, the former widow of Wm. H. Twyman, deceased, and Thomas Heald, her husband, dated February 11, 1885, and conveying to respondent, Catherine Donnell, two hundred and three acres of land, lying in Jackson county, Missouri, and described in said deed as being "all that part of section 12, township 49, range 33, lying east of the Big Blue river; also west half of section 7, township 49, range 32." This deed was duly acknowledged by the grantors on the day of its date, February 11, 1885, and was filed for record on that day at 2 o'clock and

three minutes P. M., and duly recorded on the same day.

This suit was commenced September 20, 1890, by the filing of the petition and the issue of summons thereon. The petition alleges that Wm. H. Twyman, the former husband of said Elizabeth, owned the land above described in fee at the time of his death, in March, 1874; that it constituted his homestead; that she, as his widow, and her children became entitled, at his death, to a homestead of one hundred and sixty acres therein, and that she also became entitled to a dower interest. That subsequently the administrator of said estate sold said land under the order of the probate court of Jackson county, and executed deeds therefor as follows: In June, 1875, one hundred acres, being the east half of section 12, township 49, range 33, east of the Big Blue river, containing fifty acres, and also fifty acres off the north end of the west half of the southwest quarter of section 7, township 49, range 32, to defendant Mack S. C. Donnell; in February, 1881, one hundred and three acres, being the east half of the southwest quarter of said section 7, (except fifty acres off the north end thereof) to John McMahon, and that McMahon conveyed the same by deed dated December 17, 1881, to defendant, Catherine E. Donnell.

That afterward, on the eleventh day of February, 1885, the plaintiff executed the deed above mentioned, and delivered the same to the agent and attorney of said Donnell; that at the time of the execution thereof, the plaintiff Elizabeth Heald was wholly ignorant of her rights in and concerning said real estate; that the execution of said deed was procured by false and fraudulent representations; that it was represented to her by the agent and attorney of Donnell that she had no dower or homestead rights in said premises, and

that whatever Donnell could be induced to pay to her would be clear gain; that her attorneys were trying to cheat and defraud her, and to obtain from her the nineteen acre tract of land described in the petition, and that he was her friend, and, notwithstanding the fact that he was the attorney of Donnell, he would exert whatever influence he might have with Donnell to procure him to pay her something, and that he would do this much for her simply because of the sympathy and friendship which he had for her; that he represented to her that the deed she was signing purported to cover only said one hundred acres sold by Noland, administrator, in 1875, and that by reason of such false statements she was induced to execute said deed.

Defendants, in their answer, deny that Wm. H. Twyman, at the time of his death, held any of the lands as a homestead, except the nineteen acre tract mentioned in the petition, and admit that she was entitled to a dower interest subject to said homestead in the other lands. They admit the administrator's sales, and allege that at the time of the first administrator's sale of the one hundred acres in 1875 by Noland, the plaintiff Elizabeth Twyman released and quitclaimed to the purchaser, Mack S. C. Donnell, all her right, title and interest in the lands then sold, and that after the sale of the one hundred and three acres by Moore in 1881, plaintiff Elizabeth Heald, then Twyman, filed her petition in the probate court of Jackson county for the court to set out her homestead in all said lands mentioned in her petition, and that the commissioner appointed therein set off said nineteen acre tract to her as a homestead, and that afterward on the execution of the quitclaim deed by plaintiffs to defendants of the other lands embraced in the petition, and at the May term, 1885, of said court, the plaintiff

Elizabeth Heald duly appeared in said court and dismissed her proceedings to set aside a homestead in said lands, and then and there had it made a matter of record in said cause that she had theretofore sold her interest in the land embraced in the report of the commissioners therein to set aside homestead to said M. S. C. Donnell. They deny all the allegations of fraud in the procurement of said quitclaim deed, and plead ten years' adverse possession of the one hundred acres embraced in the administrator's deed made in 1875.

The testimony on the part of the plaintiffs in regard to the execution of this quitclaim, consisted of the evidence of Mrs. Heald, herself, and her husband, her brother, W. B. Hale, her sister, Mrs. Brock, and Mrs. Mary Ann McDuval. As to the deed of June 8, 1875, Mrs. Heald, alone, testifies in her own behalf.

Her testimony in regard to her execution of the quitclaim of 1875, is so inconsistent, and unsatisfactory, and so contradictory of the admitted facts in the case, that no court could afford to set aside a conveyance on it. The facts as to that very clearly appear that the administrator made a private sale, the purchaser stipulating it should include her dower and paying a full price therefor. That deed shows on its face that it was made at the same time the administrator's report of the sale was made to the court, and even before that deed was executed. But as that deed is not assailed in this cause, and as the defendants have been in the undisturbed adverse possession of the one hundred acres described in it for more than ten years, her testimony in regard to that is only important when it is to be weighed along with her evidence as to the fraud in procuring the other deed, of February 11, 1885.

She states that she was informed of her dower and

homestead right in 1881, and on August 13, 1881, she began a proceeding in the probate court of Jackson county to have a homestead set off to her and her minor children in the two hundred and twenty-two acres of land left by her husband at his death, March 18, 1874. In 1883, the commissioners set apart as a homestead, the nineteen acres, on which the family resided at the time of her husband's death, valued at $633.33, and forty acres off of the north side of the one hundred and fifty-three acre tract, the southwest quarter of section 7, township 49, range 32, at a valuation of $866.66⅔, altogether a homestead of fifty-nine acres of the value of $1,500.

At the August term, 1883, Mack S. C. Donnell, one of these defendants, who had purchased the one hundred acres of the administrator Noland, filed objection to the report by his counsel, Messrs. Philips, Comingo & Slover. At the February term, 1884, his exceptions were sustained except as to the nineteen acres. Thereupon the commissioners were reappointed and made a report setting off in addition to the nineteen acres, forty-three and one-third acres off of the south side of the southwest quarter of section 7, township 49, range 32, and thereupon Mrs. Donnell and her husband filed exceptions to its confirmation. While this proceeding was pending the following papers were filed in said probate court in said cause, on February 11, 1885:

"*In re* Elizabeth Twyman, now Heald, for homestead.

"In the probate court of Jackson county, in Independence, Missouri, to the February term, 1885.

"Objectors therein show the court that the commissioners' report ought to be set aside for the following reasons:

"*First.* They now hold a quitclaim deed to the

lands in said report set aside to the said Elizabeth Heald, formerly Twyman, as a homestead, except the nineteen acres hereinafter specified.

"*Second.* That the said Elizabeth Heald, formerly Twyman, now holds a tract of nineteen acres in Jackson county, Missouri, more or less, and did hold the same at the time of her application to have homestead set aside, and that said land so held by her is of more than the value of $1,500.        G. W. STALEY,

"Att'y for Objectors."

(Indorsed)

"*In re* Elizabeth Twyman for homestead."

"Additional objections to report of commissioners *in re* Elizabeth Heald, formerly Twyman."

"Filed February 11, 1885.

"JAMES H. SMITH,

"Clerk."

Thereupon the cause was continued until the next regular term thereof, and at the May term, 1885, of said court, the judgment of dismissal thereof was made and entered as follows:

"STATE OF MISSOURI, \
County of Jackson. ⎰ ss.

"Probate court at Independence, May term, 1885, May 13, 1885.

"In the matter of proceedings to set aside homestead to Elizabeth Heald (formerly Twyman), the widow of William H. Twyman, deceased.   574.

"Now on this day comes Elizabeth Heald, formerly Elizabeth Twyman, into court by her attorney, Charles S. Crysler, and dismisses the proceedings herein to set aside homestead to her as the widow of W. H. Twyman, deceased, at the cost of M. S. C. Donnell, she having heretofore sold her interest in the

lands embraced in the reports of commissioners to set aside homestead to M. S. C. Donnell.''

The following check was identified and produced in evidence:

"$100. KANSAS CITY, Mo. Feb. 11, 1885.

"Citizens' National Bank of Kansas City, Mo., pay to Elizabeth Heald or order one hundred dollars.
"M. S. C. DONNELL.''

This check was indorsed, "Elizabeth Heald.''

"Pay and credit or order for collection account William McCoy & Son.

"Independence, Mo.
"CHAS. S. CRYSLER.''

On the eleventh day of February, 1885, the quit-claim deed herein assailed, was signed by Mrs. Heald and her husband, Thomas Heald, and acknowledged before George M. Staley, a notary republic, and duly recorded that afternoon.

In 1881 Mrs. Heald employed Messrs Sheley & Sheley to obtain her homestead and dower for her, and entered into a written contract with them whereby she was to give them one-third of the land to recover it. In drawing this contract the nineteen acres was included, she says, without her knowledge. She says Mr. Crysler first told her Sheley was going to get a third of her nineteen acres. Thereupon she sent for Sheley, and told him she understood he was going to take part of the nineteen acres, and he said, "Well, I had to do it. * * * I can't get nothing out of the bottom." Then she told him to drop it, and employed Crysler, and he advised her to dismiss the proceedings for homestead. She says, when he dismissed the suit, that she was present and knew it, and agreed to it. She says she was to get $100 from

Donnell, but she was not to give anything for it. "It was to be just as *if she picked it up in the street.*"

She does not remember getting the $100, although in her petition, she avers she did receive it. Her brother was present when she and her husband signed the deed, and read the deed *over, himself,* before she signed it. She insists that Mr. Staley, Mr. Donnell's attorney, told her it was the "Noland deed" she was signing, and that she had neither homestead or dower in it, and that her deed did not amount to anything. She says Staley and Crysler came together; that she did not know Mr. Staley, but depended upon her lawyer, whom she regarded as "little less than an angel."

Thomas Heald, the husband of Mrs. Heald, and one of the appellants, testified on direct examination that he was present when the deed was signed, and that Mr. Staley said it conveyed a piece of land sold by Mr. Noland, administrator. On cross-examination he stated that he knew his wife was to get $100 for signing that deed, and that he understood it was paid for correcting a mistake in the old deed; that it was a free offer of Mr. Donnell, and he thought she might as well accept it; that Mr. Donnell was just giving her $100, just giving away that much; that he understood she was to give nothing out of the land; that the deed did not affect her interest in the bottom land; he did not read the deed before signing, although able to read, and that the deed was not read before he signed it, and that he signed that deed because he had confidence in the parties; that he understood the deed was made for one hundred and ten acres; that no amount was mentioned, simply for some land that Noland had sold.

W. B. Hale, a brother of Mrs. Heald, testified that he was present when the deed was signed; that when they came in to sign the deed he was in the opposite

room, and when he came in they were reading the deed, and his sister turned to him and said "Is that all right, brother?" He replied, "I guess so." He then said to Staley, "It only conveys the land Mr. Noland sold anyway," and Staley replied, "That is all; just the Noland sale of the land." And then witness told his sister that it was all right to sign it. On cross-examination, this witness testified that he was not present during all the conversations between Staley and his sister; that he did not hear all the deed read that night; he got in the room when they were reading the deed. That they had got pretty well through reading it when he got into the room; that, besides his sister and her husband, there was someone else in the room when the deed was read, but who it was he can not remember; that Mr. Staley was reading the deed when he went in; that it was at night; it was just getting dark, and it was signed by them that night, or, at least, they went through the motion, and that this was the time of the conversation.

Mary Ann McDuval, a witness for appellants, testified that she lived in Independence and was present when Mr. Crysler and Mr. Staley came down to Mrs. Heald's house to see about a deed; that there was Mr. Crysler and Mr. Heald and another gentleman she did not know, and that Mr. Crysler said to Mrs. Heald, "Here is this deed for you to sign," and she says, "Mr. Crysler, is it the Jess Noland deed?" and he says, "It is." Well, that man she did not know, unrolled a piece of paper from around a roll, it was all rolled up, and unrolled it just far enough for her to write her name, and Mrs. Heald says to her, "Bettie, do you know what you are signing?" and she looked up to the man that had the deed and says, "It is the Jess Noland deed?" he says "It is the Jess Noland deed," and he says "There is nothing here for you"—

that is the way he expressed it, and so far as the $100 draft was presented, there was no money nor check given, now, for she saw with her own eyes.

For the defendants, Mr. Crysler testified that he represented Mrs. Twyman, now Mrs. Heald, as her attorney in the proceedings relating to the apportionment for a homestead, and that respondents were represented in the first place by Comingo, Slover and Philips, then by Comingo and Slover, and then Judge Slover went on the bench, and Geo. W. Staley represented them; that Sheley & Son, a firm of attorneys at Independence, had a contract with Mrs. Heald, by which they were to recover her rights in certain lands belonging to her late husband, Mr. Twyman, on a conditional fee; that they were to have one-third of the lands they recovered; that this contract was of record and in the nature of a quitclaim deed; that it covered the nineteen acre tract as well as the other lands; that he examined this contract for Mrs. Heald, at her request, and explained to her the situation, and about the time he, at her request, examined the proceedings of Moore, the administrator; that she then asked him about the matter that was pending in the probate court, and that, with her husband, her brother and father, he made an examination of the papers, taking several weeks, frequently seeing her during the time; that she told him she had a proposition to settle from Mr. Staley for $100, and wanted to know if she had a right to do that, and if she could dismiss that and keep Sheley from having an interest in the nineteen acres; that he told her that he thought she could and that Captain Comingo told her the same; that the matter ran along for some time, and Mr. Hale, her brother, came to him and said they would make that settlement for $100, and make a quitclaim deed for her interest in the bottom lands, and for him, Crysler, to see that everything was

all right; that they did not want the nineteen acres included; that after that Staley came to him with a quitclaim deed for her interest and said he had been down to see her, and she would not sign it without he, Crysler, said it was all right, and asked witness to go down to the house with him; that he went down to the house with Staley, and Mrs. Twyman wanted him, Crysler, to be particular that the nineteen acres was not involved in that, and he told her it was not, that there was nothing in the deed involving the nineteen acres at all, and told her that the deed was all right and she signed it; Staley was a notary public and took the acknowledgement; that he did not remember the number of acres intended by the parties to be embraced in the deed, but it did not touch the nineteen acres; that the deed was signed, and the $100 check given either to Mrs. Heald or to witness; that she indorsed it; that witness put the check in the bank, indorsed it, collected it, and paid her the money at her house; that he was present when the deed was executed and saw them execute it; that he insisted that Donnell should pay the costs of the homestead proceeding—and when the probate court met, he, Crysler, sent for Mrs. Heald, took her over to the probate court room with him and dismissed the proceeding; that she knew that it was dismissed, her husband knew it was dismissed, and that Sheley brought suit against her for fees under the contract a year afterward, making the basis of his suit the fact of her dismissal of this proceeding, and that that suit was tried in Independence, and Comingo and himself defended her in that suit, and it resulted in a settlement, judgment being rendered for $250 for plaintiff; that the only thing, he, Crysler, understood in regard to the deed was, that it was to be the land involved in the homestead proceedings, except the nineteen acres; that Mrs. Heald

called for his opinion as to whether she was entitled to a homestead in any of this land except the nineteen acres, and that he gave it as his opinion, that she was not; that he explained to her that this disposed of everything except the nineteen acres fully and thoroughly, and so did Captain Comingo; that there was nothing that took place between Mr. Staley and himself in this matter, aside from what he has stated— nothing whatever; and that nothing occurred between himself and Mr. Donnell; that he had no connection with Donnell, whatever, in this matter; all his transactions with Donnell were with his representative, Mr. Staley; the witness never had anything to do with Donnell in the world; that there was no such thing, as charged by Mrs. Heald, of collusion or fraud between witness and Mr. Staley; that it was a *bona fide* settlement and disposition.

When witness and Staley went down to Mrs. Heald with the deed to be executed, it was between *9 and 10 o'clock in the morning;* that the deed handed to witness is the same deed; that that deed was acknowledged on the eleventh day of February, 1885, and filed for record on the same day *at 2 o'clock and three minutes p. m.;* that it was acknowledged before Mr. Staley, and that the check in evidence is the check that Donnell gave, and that Mrs. Heald indorsed the check to him, and he collected it and paid the proceeds to her.

Witness denies Hale's evidence in regard to the Noland deed. Instead of refusing to go with Hale to the recorder's office, he went with him, got the book and page of the record of the deed, copied the description and gave it to him. George W. Staley testified that in 1885 he was an attorney at law and notary public, practicing at Independence, Missouri. He recognized the deed of February 11, 1885, as one

drawn by himself and signed by Mr. and Mrs. Heald and acknowledged before him. That he was and had been attorney for Catherine E. Donnell, that is, through her husband. That she had been objecting to certain proceedings for a homestead in regard to this land, or a part of it, that had been instituted by Mrs. Heald, who was the widow of Wm. H. Twyman, and afterward had married this Mr. Heald. That he came into the case after Judge Slover and Col. Philips had gone out of practice, and Mr. Donnell came to witness to act as his attorney. The proceedings had been going on for several years. Donnell said they could get, and had an offer made, that if he would pay $100 they would dismiss the suit. Witness thinks Donnell said he was approached by Crysler, Mrs. Heald's attorney. "I think after that Crysler spoke to me about it." He said she was a poor woman, and ought to have something; that they would have to pay up the costs, which would be something, and if they would do that they would dismiss it, and witness advised Mr. Donnell to do so. Donnell then brought a check for $100 to witness, who made out the deed, to be delivered on the delivery of the check and Mrs. Heald signed the deed; "She knew what it was, and she knew we were going to dismiss the case before we went down there." Witness did not know anything about this, except what they said. He had not made the proposition to her, or anything of that kind. The proposition had been made and accepted by her attorney. Witness can not say whether or not he represented to Mrs. Heald at the time he went down to have the deed acknowledged, that she had no dower or homestead rights in the property. He knew that his impressions were that she had no homestead right in it, and he may have stated something of the kind, but whether he did or not he don't recollect. He had nothing to do with her signing

the deed, or getting her to sign the deed. That was a fact before he saw her. It was a common occurrence for witness to fill out deeds and have them executed and acknowledged, and there would have to be something very unusual about it for him to remember anything about that. He certainly never represent to Mrs. Heald any other than what the contents of that deed was, in his judgment, at least.

On cross-examination, witness had investigated Mrs. Heald's rights to homestead or dower in that homestead proceeding and came to the conclusion that, if she had any rights, they were slight in amount; that, if he made any representations to Mrs. Heald at all— he don't think he made any—they were made simply as to the effect of this deed; that was all. He is satisfied she knew when she signed this deed she had no right in it when it was done, and she got the $100; that was all there was of it. Witness further says that he had nothing to do with getting her to sign this deed at all. When he went down there to get her to sign the deed it was all agreed, and he went down there and she signed the deed without him having to ask her at all—that was all fixed between her and Donnell before. He had no idea what, if anything, was said then by him or by anyone else, at that time, with reference to the land which had been sold by Jesse Noland, administrator, one hundred acres, and does not remember of Mrs. Heald asking the question before she signed this deed whether the deed embraced any other land than the one hundred acres. He does not remember anything about the sale of this land by Noland, or that Mrs. Heald, then Twyman, attempted to execute a quitclaim deed to Donnell for that one hundred acres. He don't recollect any of the facts which preceded the action that was taken here, except that he was in court for Donnell, but what Donnell's rights were he does not

know. He does not remember whether anything was said on the day the deed was executed, and prior to its execution, by anyone there present, as to the correction of an error in the quitclaim of 1875.

M. S. C. Donnell, one of the respondents, testified that he bought the one hundred acres belonging to the estate of Wm. H. Twyman, deceased, from Jesse Noland, administrator, June 8, 1875; that his agreement with the administrator was to furnish him a good title, by giving him the administrator's and the widow's deed; that Noland brought Mrs. Twyman to Kansas City and introduced her to him; that she stated that it was satisfactory to her, and made the deed, and he paid the administrator $700 at the time; he gave two notes for the balance; these were paid, making in all $2,000 for the land, which was its full value at the time; that in the settlement between Staley and Crysler he had no negotiations with Mrs. Heald in regard to it; that was done by his attorney, Mr. Staley; that he gave the $100 check and put the deed on record the same day he got it.

I. It is perfectly competent for a court of equity to set aside a deed for fraud, but to justify a court in so doing, there must be something tangible and definite in the evidence. Mere surmise will not do. This bill proceeded in the first instance on the theory that Mrs. Heald was totally ignorant of her dower and homestead right; second, that her attorney colluded with the purchaser at the administration sales and fraudulently induced her to sign the quitclaim of 1885. But the whole substratum is swept away when she herself testified that as early as 1881 she claimed a homestead and dower in the whole two hundred and twenty-two acres, of which her husband, Mr. Twyman, died seized, and it appeared that she had employed Messrs. Sheley & Son to prosecute her claim. The suit was

commenced and had been pending nearly three years.

She had dismissed Judge Sheley and employed Crysler, and yet she avers in spite of all this that she was ignorant of her rights. Her charges against her counsel are entirely unsupported. His testimony is full, rational, consistent with the record and utterly refutes the charge of collusion.

Equally baseless are the reflections upon Mr. Staley, the counsel for Mr. Donnell. We discover nothing evasive or inconsistent with personal or professional integrity in his conduct in this matter. Mrs. Heald says, herself, she relied not on Staley, whom she did not know, but upon Mr. Crysler, her own attorney. When it is remembered that Mrs. Heald was in the enjoyment of her homestead of nineteen acres; that it was near Kansas City, and that it was two and one-half miles from the lands in which the homestead was sought and that she had already, over ten years before this, made a deed to her interest in one hundred acres of the land, it becomes apparent that there were two grounds upon which the homestead, in the one hundred and three acres, might fairly be questioned.

*First,* if her homestead in the nineteen acres was worth $1,500 at the death of her husband, of course she had no homestead elsewhere. *Second,* it was open for proof whether this one hundred and three acres was used and occupied in connection with the home on the nineteen acres. But, whether she was entitled to homestead or not, she had employed her own counsel. She was fully advised by them of her rights, and Mrs. Donnell dealt with her through these counsel and was not responsible for their advice. She and her brother advised her counsel that they desired to effect this settlement.

There is absolutely nothing substantial upon which

VOL. 121—28

to sustain the charge of fraud in the procuring of the deed. She was surrounded by her sister, her husband, and her brother, who read the deed in full and was represented by her own chosen attorney, at the time it was executed. Her testimony is not ingenuous. Her attempt to evade her receipt of the money, and her signature on the check and her wholesale charges of fraud on all the counsel on both sides do not commend her case to a chancellor. After a careful reading of this evidence we do not see how the learned judge who tried this cause could have reached any other conclusion than he did. Solemn business transactions, in which title to valuable lands are transferred are not to be set aside by such inconsistent and unsupported evidence as was offered in this case. The judgment is affirmed. All of this division concur.